Thank you, Your Honor. May it please the court, Francis Wickstrom appearing before the appellants. We've referred to them as Life Technologies because there's been a corporate change and so throughout our brief we refer to as Life Technologies or LTC. We were asking this court to reverse the preliminary injunction that was issued by Judge Shader for a number of reasons. I'd like to focus on two of those reasons. The first is the record in this case cannot support a damages that were referenced by the court are readily quantifiable. In fact, they were quantified by the plaintiff's experts. If this evidence equals irreparable harm, it's very difficult to imagine a case in which irreparable harm would not be found. The reasons that are stated... Well, but you're not... this isn't a legal question. I mean, you're not challenging the analysis or the qualification, lost business opportunities, loss of goodwill. Those are all criteria that definitely belong in the analysis of whether or not there's irreparable harm, correct? Yes, yes they do. So your argument boils down to a question of the facts to challenging the district court's factual analysis based on the record beforehand. Yes, it was clearly erroneous because in this case CELSIS established that what you have is a two competitor market and so any loss of goodwill can easily be quantifiable in a two competitor market. Yeah, but they had testimony. I mean, it seems to me though on the record, so you can tell me where I'm... what I'm missing, is that they had expert testimony and they did disclose potential for loss or actual lost business opportunities, loss of government goodwill, and you put on no expert in response and so it's just looking at... I mean, whether he's right or wrong, that doesn't almost matter. It's a question of whether or not based on the discretion in weighing the evidence and I'm not seeing where that fell short given the lopsidedness of the evidence with regard to irreparable harm. Your honor is correct about the the evidence, but if you will note that the actual lost sales were calculated to the dollar and the price erosion that they put in was calculated to the dollar, that the price drop over the years. Interestingly enough, the biggest price... and they have a chance to move up in the market, which is being denied them without this injunction. Well, in a two competitor market... Kind of rolling all of this reputation goodwill lost business together into one. That's true. I guess what we're really arguing is on these facts is that it... goodwill is not a fact... should not be or cannot be a factor as a matter of law in a two My client is wrongfully in the market. Every sale... Well, let me step back. If someone wants these sales, they have two choices. They can buy them from my client or they can buy it from plaintiff and if they don't buy it... if they buy it from us, then they'll certainly be arguing at a further point in this litigation that that sale belonged to them. If the price goes down because of the competition between the two, that is absolutely quantifiable because they had a monopoly price that they could establish early on and that price has gone down. So what does goodwill mean in a situation where there are only two competitors or potentially only one competitor? If it's ultimately ruled that this patent is valid and enforceable, then they can raise the price to anything they want and goodwill is pretty much irrelevant. I guess there are substitutes in the market. They can go back to the prior art method of just mixing them themselves, can't they? They could do that, your honor, yes. And so all of that opportunity to replace that market would be lost to Celsius as well. But that was pretty well established by the course of conduct, the evidence. Once these products came on the market, they were readily accepted and no one is, at least no significant segment of the market, is out mixing them themselves. So that is our first argument. The second point that I would like to make is a question of law and that is that a substantial question was raised below on the issue of obviousness that was not rebutted by the plaintiffs. The district court failed to apply the KSR analysis. Instead, the analysis that the district court applied was clearly the old TSM approach, which was rejected by KSR. TSM was rejected by KSR? Well, to the extent that, I mean, I think a rigid approach to TSM was rejected, but TSM is nothing more than an evidentiary requirement of the statute, isn't it? That's correct, your honor. You have to base it on evidence that was before the time of invention. That's all TSM is. But, but, and that is not changed, is it? That has not changed, but the KSR analysis applies exactly to this case because this is a case where we have nothing but a repeat of a known element and that element is freezing according to its established function to achieve a predictable result. Well, here again, I mean, It's also one less step, right? They eliminated one step at the end? What was known in the art, your honor, was freeze, thaw, use a density-graded fractionation, and, and then separate and recover the viable hepatocytes. He added freeze one more time without any of the following steps. Steps. Yes. So, all of those elements of freeze, thaw, a density-graded fractionation, recovering viable hepatocytes were well known. Well, right off the bat, you say to yourself, freezing kills cells, why would you do it again? Doesn't all of the art kind of teach away from doing that sort of thing? Your honor, the art doesn't teach one way or the, which is another point I guess you, for 20 years you have a crowded field here with vast amounts of literature and discussion and not once is there a reference over all those many years that mentions multistep chiral preservation. The Molle reference does reference... I read that and by the But, your honor, the, our experts testified that, of course, freezing does diminish viability by about 15%. In response, their experts said it's not a mathematical question, it's a biological question, but the interesting thing is, is that in the record, the inventor himself, when he submitted a declaration to the patent office, applied the very mathematical approach they criticize us for now, saying to the examiner that the, each time you freeze it you can expect to drop it 15%. In their experts declaration, he actually turns that around and he, he puts in his declaration, he predicts that my client used a density gradient step after the second thaw based on a mathematical analysis of the, what you would expect from refreezing. And so you start with 85% viability with fresh hepatocytes, you freeze them, you lose 15. When you use the density gradient fractionation step, the prior art teaches that it raises it to about 92%. So then, it is a matter of math as they admitted in the patent prosecution, and it's clear from the, that the examiner applied that herself in the first rejection of the patent, that from 92%, if you subtract 15, you would expect to get better than 75, 70% viability there. Well, if this is so clear and so mathematical, why is there nothing on this for 20 years? Your Honor, there's nothing either way. No one says... Well, but this is, we're all admitting that this is a very wonderful thing, that the market has recognized it, it's been successful. As you say, nobody would go back to the mixing-it-themselves method. It's been an advance, and yet no one mentions that great advance for 20 years? Well, Your Honor, that we, it's our position that under KSR, that that advance was market driven, and it's just a basis, based on common sense. And KSR tells the district court that it should have... Common sense, you think, would have been mentioned one time in 20 years? Well, here's, here's the thing, Your Honor. Market advantages would have been mentioned one time in 20 years? The, what's happening in the market is people are buying individual frozen hepatocytes and pulling them. Yep. Then they throw away 60% of them. So those are just wasted. The other driver in the market at the time is that people know that it's nice to have consistency from these tests for, for pharmaceutical purposes. And so the choice facing the person in the market at that point is, should I throw these away, or should I put them in the freezer again? And when there are a finite number of choices available based on the market conditions... Well, that market was in existence the entire 20 years. Why didn't it inspire somebody to do the obvious thing, the I take issue with whether that market existed for 20 years. This has been a recently developing market, and it was only when these cells came on, became available in the last few years, that people have recognized that. There's also been a change in the availability of liver cells. The higher quality liver cells are not as available. Can you show me in the record, I know you had the experts, Gupta and Lee, where there was testimony. What evidence did you put on that one of had reason to perform the step twice? Did you put on any expert testimony in that regard? Just, just the testimony of Gupta, Your Honor, and, and the... Well, can you show, I mean, I, I don't see it in his testimony, so... Your Honor... It's not unread. Did he testify that one of ordinary skill in the art would have had reason to perform the second step? Yes, Your Honor, I can't give you the page site, but I believe that he testified that was, it was predictable that if you froze them a second time, that you would get better than 70 percent viability. Do you want to save your rebuttal time, Mr. Wicks? Your Honor, I have three minutes. Is this my total time left? Yeah, that's your total time. Yes, I do want to preserve it. Thank you, Your Honor. Thank you, Mr. Wicks. Mr. Kelly, you have your time. May it please the Court, my name is Adam Kelly. I am my co-counsel, Jordan Seigal, represent the Apo Lee, Celsus In Vitro, Inc. The first issue I'd like to address is the process of infringement. Specifically, the claim term without requiring. Can I ask you, what's the status currently? Is the trial moving forward before the district court? We are, Your Honor. What's the status of your case? Yeah, we just concluded a second preliminary injunction proceeding on a design around process and the case is moving towards trial. We haven't set, we haven't officially set a trial date yet, but we're scheduled to be back before the district court on May 10th. The appellant's reply brief between pages 9 and 12, they raised the argument that we, the Apo Lee, have raised for the first time on appeal, the issue of the construction of without requiring. Let's unpack that. Review of the record shows that the appellant raised the argument for the very first time in their closing statement of the preliminary injunction hearing. That's reflected on the record in the Joint Appendix 3009. Immediately upon raising that, the district court flatly rejected that proposed construction that without requiring somehow meant prohibited. The district court raised it in response to Life Technologies' argument that without requiring should have meant being a step that's prohibited in the claim. The district court not only rejected it, but then expressed its own That's also on the same page, 3009. But the district court later, before issuing the preliminary injunction ruling, the parties appeared before the district court on the issue of whether to extend the agreed upon TRO an additional amount of time to give the district court sufficient time to render the opinion. So this is between the time after the post-hearing briefs were filed, but before the district court had officially ruled on the preliminary injunction. It was at that hearing that the district court, sua sponte, characterized that position as hokum. And we've set out in our brief on page 27 the exact quote and his understanding of what the claim term without requiring means. Setting that issue aside, that this issue was front and center before the district court, Life Technologies goes on to argue that even if it weren't, and this court were to consider that issue, that there's insufficient proof that their product exhibits a viability greater than 70% without the presence of a medium for which they recommend to customers to use, which is called CHARM. The record reflects, however, that that is not the case. Can I ask a question about the bond and the amount of the bond? Was it set at the proper amount to reflect the equities in this case? The bond was set in association with the TRO, and it was set at $70,000 based on the information that the appellant had provided to the court. He invited the court to later present additional evidence to raise the bond in the event of a preliminary injunction being issued. Once a preliminary injunction was issued, Life Technologies did present additional evidence to the court, and the court was unpersuaded that that evidence justified raising the bond above $70,000. And even at that ruling, invited Life Technologies again a second opportunity to present additional evidence to raise the bond amount. And his reasoning was based on the fact that he thought a design around might work, and now you're telling us that there's a PI pending with respect to the design around? Actually, the second preliminary injunction was denied, and that was a week ago Tuesday. So the appellants are free to sell, at this point in time, a design around. So in hindsight, he was correct. He was correct. Can you turn to the validity arguments? It seems to me that this is a close question as to whether or not there's a substantial question of validity that's been raised. So can you address the points made by your friend on the other side? Absolutely. Our position is that the court properly found in applying Titan Tire that the appellants failed to show that it was more likely than not that they would demonstrate clear and convincing evidence at trial that the patent was invalid. The D'Souza reference, for which they've placed in the center of their arguments, our position is that it's cumulative to the Ostrowska reference, which was front and center before the examiner during the prosecution. We provided opinion testimony by way of the declaration of Dr. Strom, who went and analyzed not only D'Souza, but a variety of other references that the appellants are relying on to show that none of those teach anything new over what was already known before the examiner during the prosecution. Okay, so then you've got your standard of view. Just because they got a patent and the standard is clear and convincing evidence, the standard is whether or not there's a substantial question of validity. Why is there not a substantial question of validity based on D'Souza? Well, we believe that there's no reasonable expectation of success of freezing hepatocytes more than once and achieving a viability above 70. What about Dr. Gupta's testimony? Dr. Gupta's testimony, he testified that in his mind it was a mathematical calculation and that one would have that reasonable expectation of success. Dr. Strom, our opposing expert, testified the exact opposite by saying there would be no reasonable expectation of success. This isn't a simple math problem. This is actually a biological problem. And what he meant by a biological problem is surviving the first freeze. We'll call it the first winter. You're going to have some cells which are still viable, but then you have others that are damaged, which probably won't survive very much longer. You take that pool of cells, you clean them up, we'll say, or separate the viable from non-viable using the technique density gradient fractionation, so that you cull down the number of viable cells. And some of those cells are still damaged, and you freeze them again, you're not going to have the same drop as you had before, because you've had these cells that while they may have been viable after the first freeze, they're damaged even more so after the second. Which actually begs the question of the claim term without requiring, because it was known in the art that you could, although it wasn't known, the argument that the examiner made was, one would merely apply a density gradient fractionation technique again a second time to remove the non-viable cells that would then boost up the viability to get you above 70. Because let's say you have these cells coming out of the second freeze, and the viability is say 60. You could apply a density gradient fractionation technique and maybe get above 70. But the examiner asked the applicants to put in this particular language such that when you came out of that second freeze, and you're in that second thaw, your viability is already high enough at 70. As you recall, the claim as originally filed recited a 50% viability. And the examiner asked for the raise to 70, and then also the insertion of the without requiring language. But do you reach that with or without the gradient step? Without the gradient step, right? Without the gradient step, it should be 70. It should be 70. So what you're doing is skipping the step at that point. Which step? The gradient step, the second gradient step. It's not required. Because the idea is if you thaw them out, and let's say again they're 60, you're below that 70%. You could apply a density gradient fractionation step for the purpose of separating viable from non-viable, just as recited in subpart A of claim one. And that could boost your viability above 70. Now that wouldn't be fair. So there are ways to separate, or not separate, there are ways to get the cryoprotectant, that's one thing we haven't discussed here. But when you freeze these cells, you have to put a cryoprotectant on them to preserve the cell through that second freeze-thaw cycle. And it's toxic to the cell. So when you thaw them out, you have to have a way to get that stuff out of there so that you can then make use of the viable cells that survive that second winter. But the real essence of the claimed invention according to the claims then is without that second step. So you're eliminating that second step. You're diminishing that second step. It's just not required. It's not required. And that's what made it patentable. Now that leads me to ask you, what does LTC actually practice? Do they do all of the steps under the provisions of the claim?  All of their steps are done by one person? Or is that done by other people also? The record, well the record reflects, when you say one person, do you mean one party? One party. The record reflects that there were two parties who performed claim one, at least claim one. We'll talk about claim ten in a minute. But with claim one and actually making these multi-crop preserved hepatocyte preparations, there was AP Sciences, who is a company that was founded and run by Dr. Lee, who was one of the opinion witnesses for the appellants. He was contracted to create these products, provide them to Life Technologies, and they would then distribute them to their customers. There's also evidence in the record that Life Technologies at some point began practicing their own process that embodied those same steps. And our opinion witness, Dr. Strom, looked at both of those processes and found that, in his opinion, both of them infringed. But if they're looking at it from the perspective of performing eight of the steps directly, and two of the other steps are performed by others, is that direct infringement under the claim? That very well could be a contributory or an inducement issue. Likely contributory if other parties are performing final steps. If there's a relationship between the two parties, or without a relationship? If I understand your question correctly, does the relationship of the parties matter as to the performance of those other steps? Yes. I would say it could matter. But in order for whatever those final steps are, you have to be able to thaw them out to assess their viability. So at some point, Life Technologies, even if they only performed the final two steps, they have to figure out how viable these cells are in order to sell them to their customers. But if the customers then perform the last two steps, would that be performing the entire method under the claim? That could be a contributory infringement issue. Contributory requires that there be direct infringement, right? It would be direct infringement in total between two parties. But there was no evidence in the record whether they were performing certain steps that were not included with the method steps one. What we do know is that these products were sold for the intention of being used for in vitro drug metabolism studies, which gets us to claim 10. With claim 10, that claim only requires, there's essentially two steps, determining metabolic activity and then using a particular type of hepatocyte preparation that had certain characteristics. Isn't there a question in the record as to whether or not there is a performance of all of the steps by LTC's customers in pursuant to claim one and claim 10? Well, with respect to claim, I'll start with claim 10. With respect to claim 10, the only evidence that we have is that of Mr. Hunkler, the appellant's marketing employee who testified that these products are sold for drug metabolism studies. As far as claim one is concerned, we read the claim such that Life Technologies performed all of the steps and that these products were sold having performed all of the steps in claim one. The record doesn't mention joint infringement, does it? The record does not mention more than one party performing the steps, does it? Well, it does, Your Honor, if we're looking at what AP Sciences, the steps that they performed, and then you look at the steps that Life Technologies performed. I would point the court on that same point, Your Honor. I would point the court to Joint Appendix page 217 and 216. Returning to my prior point, that the appellant's brief and their reply brief in pages 11 and 12, they make the notion that there is not evidence in the record that their hepatocyte preparations exhibited a viability above 70% without the use of their medium charm, which they recommend to their customers. It's not a requirement for their customers to use. I would direct the court to Joint Appendix 2522, which discloses the Williams E medium, which is above 70%, as well as the charm, which is there above that. Dr. Strom provided testimony on this particular point in Joint Appendix 234, and Mr. Hunkler admitted at Joint Appendix 2781 that their products are sold with viabilities over 70%. Any final comments, Mr. Kelly? In my final comment, in the reply brief, the appellants raised the issue of the pending re-exam. We believe that's irrelevant to this proceeding because that information was not before the district court during the preliminary injunction. And even if it were, if you look at the basis of the office action that was issued by the Patent Office, it doesn't include the de Sousa reference, which is the central reference that the appellants argue. Okay, thank you, Mr. Kelly. Thank you. Mr. Wickstrom? Your Honor, first in response to Judge Prost's earlier question, I would direct, invite the court's attention to page A2897 of the record. This is the testimony of Dr. Lee, Your Honor, where he says he would expect to get at least 70% after a second re-freeze. That's in addition to the declarations that were filed by Gupta and Lee, and I believe Gupta's testimony as well. Briefly, I'd like to address the bond issue. The bond was wholly inadequate and the court applied in an appropriate standard, forcing parties to guess what their mitigation costs would be, and to use the bond that was in place for a very short TRO period as the bond for preliminary injunction. But is it correct that the district court gave you an opportunity to come forward with an argument or evidence to demonstrate that and fail to do that? We actually did file a motion to increase the bond. We put some evidence before the court with respect to our design around the design around. It is true the preliminary injunction was just denied, but at that time, all we can predict is the cost of getting back into the market, which were about a quarter of a million dollars, and we knew some of the costs for the design around, but that's in an appropriate and inappropriate legal standard. Mitigation might apply in determining damages at the end of the day, but to say that put a cap on our damages of $70,000 would be error. I'd like to speak for my last couple minutes about, in respect to Your Honor's question, there is no direct infringement by my client in the record. What my client does is they sell them frozen, so somebody else then has to thaw them, and what we do is we do recommend, strongly recommend, that they use charm medium. The record shows that charm medium enhances viability, and so as we briefed it on the issue of infringement, what they have is a failure of proof, because they did not demonstrate that without that second enhancement by use of the charm medium, that the viability would exceed 70%. And finally, I'd like to briefly- And that argument is made in your briefs here? Yes. I'd finally like to address the PTO reexamination that did- Now, your LTC sales literature, however, lists the percentage of viability for your products, right? It lists that as well over 70%. Yes, but that's based on applying the charm medium in a- It sounds to me like you're doing all the steps. If you're claiming that final result- Certainly in testing, we have done all the steps. No, your sales literature says that's precisely the percentage viability of your products. That customers can expect- It says it's going to be between 75% and 85%. Yes, Your Honor, that's what customers can expect when they thaw them out and apply the charm medium as recommended by my client. But they get them frozen. Sounds to me either like you're controlling your client's procedures, or you're doing it yourself. Well, it's a recommendation to the customer, Your Honor, and I don't think that is control, but- Well, it's your sales literature says that's what you produce. That's what they- How do you produce it if you don't do it? That's what they can expect. I think there's a big difference when you're selling a frozen product. And in the last two or three seconds I have left to me, the PTO has determined that there is a substantial question, granted reexamination, rejected all of the claims, and under standard havens, clearly this preliminary injunction should not stand in the face of that rejection. Thank you. Thank you. That concludes the morning. All rise.